713 S.E.2d 809

THE AFFILIATED CONSTRUCTION TRADES FOUNDATION, A Division of the West Virginia State Building and Construction Trades Council, AFL–CIO, Plaintiff Below, Appellant

v.

WEST VIRGINIA DEPARTMENT OF TRANSPORTATION, Division of Highways; and Nicewonder Contracting, Inc., Defendants Below, Appellees.

No. 35742.

Supreme Court of Appeals of West Virginia.

Submitted May 10, 2011.

Decided June 22, 2011.

Vincent Trivelli, Esq., Law Office of Vincent Trivelli, PLLC, Morgantown, WV, for the Appellant Affiliated Construction Trades Foundation.

Anthony G. Halkias, Esq., Jeff J. Miller, Esq., West Virginia Department of Transportation, Division of Highways Legal Division, Charleston, WV, for Appellee West Virginia Department of Transportation, Division of Highways.

Forrest H. Roles, Esq., Robert M. Stonestreet, Esq., Dinsmore & Shohl, LLP, Charleston, WV, for Appellee Nicewonder Contracting, Inc.

KETCHUM, J.:

The Affiliated Construction Trades Foundation ("ACT"), a division of the West Virginia State Building and Construction Trades Council, AFL–CIO ("Council"), appeals the May 7, 2010, order of the Circuit Court of Kanawha County dismissing its Declaratory Judgment action against the appellees, West Virginia Department of Transportation, Division of Highways ("DOH") and Nicewonder Contracting, Inc. ("Nicewonder").

In dismissing ACT's Declaratory Judgment action, the circuit court concluded that ACT lacked standing to bring the lawsuit because it had not suffered a cognizable harm capable of being redressed by favorable judicial decision. For the reasons set forth in this Opinion, we find that ACT has standing to bring the Declaratory Judgment action, reverse the circuit court, and remand this matter for further proceedings consistent with this Opinion.

## I.

### Facts and Background

In early 2003, the DOH and the United States Federal Highway Administration (FHWA) were asked to consider a proposal by a local coal operator, Premium Energy. Under the proposal, Premium Energy sought to surface mine an approximate three-mile area where the future King Coal Highway was to be constructed. If granted the permit, Premium Energy would use the excess mining material to construct the roadway

beds needed for the new highway.[1] While Premium Energy's proposal was being considered, the Mingo County Redevelopment Authority ("Redevelopment Authority") made it known that it would like to use some of the land adjacent to the proposed three-mile section for commercial development, but that the desired location would require fill and leveling.

A field review of Premium Energy's proposal was conducted by the DOH and FHWA. In the summer of 2003, Premium Energy's proposal was approved with conditions. Premium Energy would be permitted to surface mine the area, but would be required to use the excess mining material to construct the highway roadbed and also to construct a large flat area adjacent to the new highway that would be used by the Redevelopment Authority for commercial development. Premium Energy agreed to the terms and was issued the necessary permits. Construction on the public highway project and the commercial development site began shortly thereafter.

In the Fall of 2003, Premium Energy proposed expanding the original three-mile project to include slightly more than eleven additional miles of highway construction. This eleven-mile stretch of the King Coal Highway is known as the Red Jacket section. However, unlike the initial three-mile section, Premium Energy indicated that its coal recovery would not be sufficient to offset the entire cost of constructing the Red Jacket section and that the DOH and FHWA would need to fund part of the project. The DOH and FHWA authorized Premium Energy to submit a formal cost proposal for the project.

After receiving Premium Energy's cost proposal, the DOH and FHWA concluded that the proposal reflected significant savings in the expected cost of constructing the Red Jacket section. On May 6, 2004, the DOH entered into an agreement with Nicewonder—a company that had only shortly before been incorporated, but is nonetheless an affiliated company of Premium Energy—to construct the Red Jacket section of the King Coal Highway. Although the roadway constitutes a public highway project, the DOH did not seek public bids for either the initial three-mile project or the eleven-mile Red Jacket project. Additionally, the DOH did not include a contract provision requiring Nicewonder to pay the "prevailing wage" to its workers.

On December 2, 2004, ACT filed a declaratory judgment action in the Circuit Court of Kanawha County, West Virginia, against the DOH and Nicewonder. In its petition, ACT alleged that the DOH's letting of the Red Jacket contract to Nicewonder violated state and federal law. Specifically, ACT alleged that *W.Va.Code*, 5–22–1 *et seq.* and 23 USC § 112 required the DOH to seek public bids for the Red Jacket public highway project and, additionally, that *W.Va.Code*, 21–5A–1 *et seq.* and 40 USC §§ 3141–3144, 3146 required the DOH to include a "prevailing wage" clause in the contract for the Red Jacket project.

On December 27, 2004, the DOH and Nicewonder removed the action to the United States District Court for the Southern District of West Virginia on the basis of federal question jurisdiction. On August 26, 2005, ACT, by leave of the court, amended its Declaratory Judgment petition to name the United States Department of Transportation, the West Virginia Board of Education, and the Redevelopment Authority as additional defendants.

On September 5, 2007,[2] the District Court entered an order finding "unpersuasive [ACT's] suggestions that a negotiated contract entered into without competitive bidding was not permitted" under federal law. Regarding ACT's prevailing wage claim, the court "conclude[d] that the agreement's exemption of Nicewonder from the payment of

---

1. The King Coal Highway, being constructed though southern West Virginia, is a four-lane highway with partially controlled access between Williamson and Bluefield, West Virginia. The highway, upon completion, will represent an approximate 90 mile section of the I–73/I–74 Corridor.

2. The District Court's September 5, 2007, order is not published. For general reference, the order may be located on Westlaw at WL 2577690.

Davis–Bacon wages,[3] which was endorsed by the FHWA, was in violation of an unambiguous federal statute" and directed the parties "to brief the appropriate declaratory relief for the failure to comply with the Davis–Bacon Act and include a proposed Judgment Order."[4]   Regarding ACT's state law claims, the District Court held that "[i]nasmuch as all the federal issues will have been resolved short of trial and inasmuch further as the remaining state law claims involve novel or complex issues not related to federal policy, the court will decline to exercise jurisdiction over the remaining state law claims."

On December 3, 2007, Nicewonder filed a motion asking the District Court to reconsider its earlier order finding that ACT had standing to raise the Davis–Bacon Act claims.   On September 30, 2009,[5] the District Court sustained Nicewonder's motion to reconsider, finding that ACT lacked standing "to sue in its own right or in a representational capacity on behalf of its members for the failure to pay Davis–Bacon Act wages to the laborers who worked on the King Coal Highway project."   In reaching this decision, the District Court

> conclude[d] that Congress did not intend to create a private right of action under the Federal–Aid Highway Act for a laborer under a contract that does not contain prevailing wage stipulations.   Inasmuch as the laborers could not institute this action on their own behalf, [ACT] cannot do so for them.

The District Court, having so found, reversed its September 5, 2007, order insofar as that order found ACT to have standing to raise the Davis–Bacon Act claims.   However, the District Court let stand its findings that the contract awarded to Nicewonder was not in violation of federal law requiring competitive bidding for most public highway projects.

3.  The Davis–Bacon Act, 40 U.S.C.A. § 3141 *et seq.* is the federal equivalent of the West Virginia Wages for Construction of Public Improvements Act.

4.  The record before this Court shows that the DOH filed with the District Court its Memorandum regarding the "Appropriate Declaratory Relief for Failure to Comply with the Davis Bacon Act." In one section of the memorandum titled "Proposed Procedures for Compliance with

Having resolved all federal claims, the District Court dismissed ACT's petition from its docket and remanded the state law claims back to the Circuit Court of Kanawha County.

Upon remand to the circuit court, Nicewonder and the DOH immediately filed a motion for Summary Judgment arguing that ACT lacked standing to obtain the declarations sought in its petition.   By order dated May 7, 2010, the circuit court granted Nicewonder's motion, finding that ACT failed to meet the three-pronged standard for standing established by this Court in *Findley v. State Farm Mutual Automobile Insurance Company,* 213 W.Va. 80, 576 S.E.2d 807 (2002), because ACT could not show "concrete and particularized injuries" capable of being redressed by a favorable judicial decision.   ACT timely appealed the granting of summary judgment.

## II.

### Standard of Review

■ In Syllabus Point 1 of *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994), we held that "[a] circuit court's entry of summary judgment is reviewed *de novo.*"

## III.

### Discussion

The issue before this court is whether ACT has standing under the Uniform Declaratory Judgments Act ("UDJA"), *W.Va.Code,* 55–13–1 *et seq.* to seek a declaration: (1) that the DOH's letting of the Red Jacket contract to Nicewonder violated our state law governing competitive bidding for public highway construction projects, *W.Va.Code,* 5–22–1 *et seq.;* and (2) that the Red Jacket contract violated *W.Va.Code,* 21–5A–1 *et seq.* which

Davis–Bacon", the DOH proposed to "provide in a supplemental agreement with [Nicewonder] for the payment of back wage differentials, as well as to require that payment of future wages comply with the customary and usual federal-aid highway provisions implementing the Act."

5.  The District Court's September 30, 2009, order is not published. For general reference, the order may be located on Westlaw at WL 3188694.

requires that public improvement project contracts include provisions requiring that all laborers hired to work under the contract are paid at least the "fair minimum rate of wages" established by the State Commissioner of Labor, *i.e.*, that the laborers are paid the "prevailing wage".

The circuit court concluded that ACT did not meet the elements of standing established in *Findley* and, therefore, did not have standing to bring the Declaratory Judgment action. We begin our discussion with the circuit court's mistaken application of *Findley*.

### A. Standing—The *Findley* Standard

In Syllabus Point 5 of *Findley*, Justice Davis, writing for the Court, articulated the elements of first party standing, holding that:

> Standing is comprised of three elements: First, the party attempting to establish standing must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

We find the manner in which the circuit court applied *Findley*[6]—a standard to assess *first party standing*—to be in error. Two years after *Findley*, Justice Davis emphasized in her concurring opinion in *State ex rel. Abraham Linc Corporation v. Bedell*, 216 W.Va. 99, 602 S.E.2d 542 (2004), that *Findley* established the elements of first party standing. She stated:

... the issue of standing may be presented in the context of a litigant asserting an alleged right that is unique to him or her. This is known "as first party standing[.]" In *this specific context*, we articulated the elements for establishing standing in syllabus point 5 of *Findley* [.]

216 W.Va. at 112, 602 S.E.2d at 555 (Davis, J., concurring)(emphasis added) (citations and footnotes omitted).

■ *Findley* is this Court's standard for determining whether a *first party plaintiff* has standing in a given case and the inquiry is one of whether a particular plaintiff has standing to sue in his or her (or its) own right in a particular case. In the record before us, ACT neither asserts, nor seeks, standing as a first party plaintiff. Instead, ACT asserts that its standing derives from its representational capacity of its affiliated members. In other words, ACT claims *representative standing*.[7]

■ For purposes of future clarity, we hold that the point of law in Syllabus Point 5 of *Findley v. State Farm Mutual Automobile Insurance Company*, 213 W.Va. 80, 576 S.E.2d 807 (2002), sets forth this Court's standard for first party standing and is applicable only when a court is required to determine whether a litigant has standing to sue in the litigant's own right.

Having determined that *Findley* is not the appropriate standard for determining whether ACT has standing, we consider whether ACT meets our standards for representative standing.[8]

### B. Standing—The Doctrine of Representative Standing

Unlike *Findley*'s standard for first party standing, the representative standing doc-

---

6. We note that the circuit court discussed several standing cases cited by ACT in its response to Nicewonder's summary judgment motion; however, the circuit court ultimately applied *Findley*, as quoted above, to find that ACT did not have standing.

7. In this Opinion we make reference to our representative standing doctrine. We expressly note that representative standing is also referred to as "representational standing", "organizational standing", "association standing", "associational standing" and by other similar terms. Our use of the term "representative standing" should be

construed as interchangeable with, and not exclusive of, these other descriptive terms.

8. We note that there are other concepts of standing, *e.g.*, public interest standing, taxpayer standing, constitutional *jus tertii* standing, the special standing standard for putative biological fathers set forth in Syllabus Point 2, *State ex rel. Silver v. Wilkes*, 213 W.Va. 692, 584 S.E.2d 548 (2003), and other concepts of standing. However, we need not discuss them in this Opinion because they are not applicable to the factual scenario at issue in this appeal.

trine is uniquely applicable to address the particular scenarios and dilemmas that a court must consider when an organization [9] such as ACT seeks to invoke its jurisdiction to hear a case. This is particularly the case where the association seeks to invoke a court's remedial powers on behalf of its members in a declaratory judgment action. The role of an organization in representing its members' interests was aptly noted by the United States Supreme Court in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (citations abbreviated):

> [T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. "The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 187 [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Jackson, J., concurring); see *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 [78 S.Ct. 1163, 2 L.Ed.2d 1488] (1958) (association "is but the medium through which its individual members seek to make more effective the expression of their views").

The Court in *Brock* further explained that there are "special features, advantageous both to the individuals represented and to the judicial system as a whole, that distinguish suits by associations on behalf of their members from class actions." *Id.* at 289, 106 S.Ct. 2523. These special features include

the undeniable fact that "an association suing to vindicate the interests of its members [can] draw upon a pre-existing reservoir of expertise and capital," and "[t]he very forces that cause individuals to band together in an association will ... provide some guarantee that the association will work to promote their interests." *Id.* at 290, 106 S.Ct. 2523.

This court recognized the inherent "practical judicial policy" [10] of the doctrine of representative standing nearly 30 years ago when we adopted it *Snyder v. Callaghan*, 168 W.Va. 265, 284 S.E.2d 241 (1981). In Syllabus Point 2 of *Snyder*, we held that:

> An association which has suffered no injury itself, but whose members have been injured as a result of the challenged action, may have standing to sue solely as the representative of its members when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

One year after our decision in *Snyder*, we clarified that our Declaratory Judgment Act authorized suits by unincorporated associations: [11]

> The language of the Uniform Declaratory Judgments Act, *W.Va.Code* § 55–13–1 *et seq.* (1981 Replacement Vol.), clearly authorizes suits by unincorporated associations in the association name and confers upon any such organization the status of a legal entity for purposes of invoking the jurisdiction of the circuit court in declaratory judgment actions.

Syllabus Point 1, *Chesapeake & Ohio System Federation, Brotherhood of Maintenance of*

**9.** Our use of the term "organization" in this Opinion should be construed as consistent with that defined in the West Virginia Labor–Management Relations Act, *W.Va.Code*, 21–1A–2(a)(5) [1971](emphasis added), which defines a "labor organization" as:

"Labor organization" means any organization of *any kind*, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, *in whole or in part*, of dealing with employers con-

cerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

**10.** *Brock, Id.*, at 290, 106 S.Ct. 2523.

**11.** The circuit court found that "ACT is an unincorporated division of the West Virginia Building and Construction Trades Council, AFL–CIO ("Council")."

*Way Employees v. Hash,* ·170 W.Va. 294, 294 S.E.2d 96 (1982).[12]

■ Having reviewed developments of the representational standing doctrine,[13] we today reaffirm its unique place in our state's jurisprudence. However, our review does lead us to conclude that Syllabus Point 2 of our decision in *Snyder* contains verbiage that is potentially misleading and that is otherwise unnecessary to plainly state our standing doctrine. For example, the use of the word "may" in Syllabus Point 2 of *Snyder,* as opposed to the word "has", could conceivably mislead courts to believe that representative standing is a discretionary doctrine. It is not. If an association seeks representative standing, and the standards we have established for such standing are satisfied, the association *has* standing. Additionally, we find the use of the phrase "challenged action" in Syllabus Point 2 of *Snyder* would be more aptly stated as "disputed matter." An essential tenet of our concept of standing is that there be a justiciable controversy and one factor of a justiciable controversy is that there be a matter in dispute.[14]

■ Accordingly, we hold that the point of law announced in Syllabus Point 2 of our decision in *Snyder* is modified. In its place we hold that an organization has representative standing to sue on behalf of its members when the organization proves that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[15]

Having thus determined the applicable standard, we now apply it to the facts of the appeal before us.

We begin our analysis by initially noting that some of the more germane facts of this case are undisputed. These undisputed facts include that the DOH let out a public highway construction contract to Nicewonder without seeking public bids; that the contract to Nicewonder did not contain language requiring Nicewonder to pay a prevailing wage to its laborers; that the contract would be paid, in part, with public funds; and that Nicewonder does not pay its workers for the Red Jacket public highway project a rate of pay that is equal to or in excess of the prevailing wage.[16]

12. While we do not retreat from Syllabus Point 1 of our decision in *Chesapeake,* we do take this opportunity to clarify that the cited point of law should not be misconstrued to mean that an unincorporated association is not required to have standing. While an unincorporated association is authorized under the Uniform Declaratory Judgment Act to file suit, the unincorporated association still must demonstrate standing under the applicable standing doctrine it seeks to utilize. Accordingly, to the extent that Syllabus Point 1 of our decision in *Chesapeake & Ohio System Federation, Brotherhood of Maintenance of Way Employees v. Hash,* 170 W.Va. 294, 294 S.E.2d 96 (1982), may be construed to imply that an unincorporated association (or any party entitled to bring a declaratory judgment action), is not required to show that it has standing beyond the fact that it is an "unincorporated association," it is modified.

13. Our review reveals that forty-three states (including West Virginia) have adopted some version of representative standing.

14. Our decision in *Adkins v. Merow,* 202 W.Va. 492, 497, 505 S.E.2d 406, 411 (1997), illustrates the situation where a "challenged action" does not necessarily mean that a justiciable controversy exists. In *Adkins* we were asked to answer four certified questions. In reviewing those questions, we determined that the forth certified question, requiring interpretation of a state statute, did not present a justiciable controversy because both parties initially urged the same interpretation of the "challenged" statute. We found that because both parties sought the same interpretation, a justiciable conflict on the particular issue—and thus standing—did not exist because true adversity did not exist (*i.e.,* no "friendly" lawsuits).

15. We do not find necessary for the modified point of law we today announce to include the prefatory statement contained in Syllabus Point 2 of *Snyder* that "An association which has suffered no injury itself. . . ." The law is well settled that an association need not suffer an injury itself in order to have representative standing and we today so hold. *See e.g. Brock, supra,* 477 U.S. at 281–282, 106 S.Ct. 2523 (citations abbreviated), where the Court observed that:

> It has long been settled that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members.

16. In response to Request for Admissions filed by ACT, Nicewonder admitted that it paid its workers at a rate below the prevailing wage.

Upon information and belief, Nicewonder is not paying wages and other benefits to its em-

### Representative Standing—First Prong

■ The first prong of our standard for representative standing requires that ACT must show that "at least one of its members would have standing to sue in their own right." This prong requires us to make two determinations. First, who are ACT's "members" for purposes of our representational standing doctrine. Second, does even one of ACT's members have "standing to sue in their own right" based upon the facts of the case.

*ACT's Membership:* The record contains two affidavits from ACT's director, Steve White. In the first affidavit, dated March 28, 2008, Mr. White attests that:

> The central objects and princip[les] of ACT include but are not limited to protecting, aiding and assisting affiliated local unions and members with regard to wages, hours and working conditions of construction workers; providing construction contract bid information; monitoring compliance with State and Federal wage and bidding laws; and providing legal services to aid in the achievement of those goals.

In a second affidavit, dated March 23, 2010, Mr. White attests that ACT "is a labor organization that represents more than 20,000 residents of West Virginia and surrounding counties[.] Many of the construction workers represented by ACT are regularly employed in construction projects such as the construction of the King Coal Highway." Mr. White explains that the 20,000 residents it represents are from a total of 56 local unions and 5 local building trade councils, "which are directly interested in public construction within the State of West Virginia." Mr. White further attests that many of the affiliated local unions, who have collective bargaining agreements with contractors, "are directly involved in the construction of public projects similar to the construction of the King Coal Highway."

Mr. White's affidavit also attests that "[a]ll of the local unions affiliated with ACT are protecting and representing the interests of the construction workers of their local union through ACT's prosecution of this civil action." Mr. White concludes his March 23, 2010, affidavit by noting that one of the "objects and princip[les] of ACT is to carry out the duties and objectives set forth in the Constitution and By-laws" and for "such additional purposes and objectives not inconsistent therewith and which will further the interest of the Council and its members directly or indirectly[.]"

The record shows that ACT is a division of the West Virginia State Building and Construction Trades Council ("Trades Council"). The Trades Council in turn is comprised of local construction unions and their members who work in West Virginia. As the United States Supreme Court observed in *Brock,* "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others" and, further, that "[t]he very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests." *Brock,* 477 U.S. at 290, 106 S.Ct. 2523.

It is clear to this Court that ACT is a labor organization and that it represents the interests not only of its affiliated unions, but the thousands of individual workers who make up those affiliated unions. To separate the organization of a union and say that each level of the union is mutually exclusive is to deny the individual members the purpose for their having joined a union and, more generally, the purposes behind unionization, *e.g.,* "for vindicating interests that they share with others." *Brock, Id.* This is especially so in the present case because the members number in the thousands, are all construction and trades workers, and are spread over such a large geographic area. That those members, seeking a means to best express their collective voice, would create from within their ranks an umbrella organization such as ACT is both reasonable and expected. That those members would expect ACT to

---

ployees who are employed on the construction of the project in accordance with the wage rates determined by the West Virginia Division of Labor pursuant to West Virginia Code § 21–5A–1 *et seq.* Because West Virginia Code § 21–5A–1 *et seq.* are not applicable to the project, Nicewonder has no duty to do so.

vindicate their interests is equally reasonable and expected.

In making this determination we observe that one of ACT's functions is to assist its members with collective bargaining agreements. Regarding this function, we note that in the West Virginia "Labor Management Relations Act for the Private Sector", *W.Va.Code,* 21–1A–1, *et seq.* the legislature declared:

> It is hereby declared to be the public policy of this State and the purposes of this article *to encourage the practice and procedure of collective bargaining* by protecting the exercise by employees of *full freedom of association, self-organization and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection;* to prescribe the legitimate rights of both employees and employers in their relations; to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other; to protect the rights of individual employees in their relations with labor organizations; to define and prescribe practices on the part of labor and management which are inimical to the welfare, prosperity, health and peace of the people of this State; and to protect the rights of the public in connection with labor disputes. This article shall be deemed an exercise of the police power of the State for the protection of the welfare, prosperity, health and peace of the people of this State.

*W.Va.Code,* 21–1A–1(a) [1971] (Emphasis added.). As we have previously observed, the West Virginia Labor–Management Relations Act defines a "labor organization" as:

> "Labor organization" means any organization of *any kind,* or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, *in whole or in part,* of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

*W.Va.Code,* 21–1A–2(a)(5) [1971] (Emphasis added.). In just this one scenario—collective bargaining—it is clear that ACT, as a labor organization, represents not only its local unions, but the individual union workers who benefit from ACT's representation.

Additionally, ACT's very name—"The Affiliated Construction Trades Foundation"—and the fact that it is a Division of the West Virginia State Building and Construction Trades Council, AFL–CIO, is unmistakably "a name and form [identifying] collective interests." *Brock,* 477 U.S. at 290, 106 S.Ct. 2523, *citing Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624, 95 L.Ed. 817 (1951). The hierarchy of ACT's membership structure is better seen from the bottom up. An individual joins a union and becomes a member of that union. The union that the member joins is also affiliated with a trades foundation, with the latter having as part of its purpose the mission statement of:

> protecting, aiding and assisting *affiliated local unions and members* with regard to wages, hours and working conditions of construction workers; providing construction contract bid information; monitoring compliance with State and Federal wage and bidding laws; and providing legal services to aid in the achievement of those goals. (Emphasis added.).

Steve White affidavit, *supra.* It is clear to this Court that the individual union members, who joined their respective unions, clearly believed they would benefit from ACT's mission statement. Simply because "unions" are the intermediary does not mean that ACT does not have standing to represent the collective interests of the individual union members under our representative standing doctrine.

*Members standing to sue:* Having determined that ACT's members include both its affiliated unions and the individual members of those affiliated unions, we must next consider whether any of those members, standing alone, has a disputed injury capable of being redressed by a favorable judicial decision, *i.e.,* would the individual member have standing in his or her own right to file suit. *See* Syllabus Point 2 of this Opinion. *See also* Syllabus Point 5, *Findley, supra.*

ACT asserts that its members have been injured by the DOH's failure to seek competitive bidding for the Red Jacket public highway project and by the failure of the DOH to require Nicewonder to pay a prevailing wage to those who worked on the public highway project. The question is, would even one of ACT's members have standing, under the standard set forth in Syllabus Point 5 of *Findley*, to sue in their own right for those alleged injuries. We find that they would.

In Syllabus Point 1 of *Shobe v. Latimer*, 162 W.Va. 779, 253 S.E.2d 54 (1979), we held that:

> When significant interests are directly injured or adversely affected by governmental action, a person so injured has standing under the Uniform Declaratory Judgments Act, *W.Va.Code* § 55-13-1 *et seq.* [1941] to obtain a declaration of rights, status, or other legal relations.

We further held in Syllabus Point 2 of *Shobe* that "[f]or standing under the Declaratory Judgments Act, it is not essential that a party have a personal legal right or interest." In Syllabus Point 3 of our decision in *West Virginia Utility Contractors Association v. Laidley Field Athletic and Recreational Center Governing Board*, 164 W.Va. 127, 260 S.E.2d 847 (1979), we held that "[f]or the purposes of a declaratory judgment action, a justiciable controversy exists when a legal right is claimed by one party and denied by another."

In *Laidley*, the defendants awarded a $1,100,000 public project contract to a contractor without a competitive bidding process. The *Contractors Association* filed suit for a declaratory judgment seeking to void the contract and require the defendants to seek competitive bidding. In responding to the declaratory judgment action, the defendants in *Laidley* moved to dismiss, arguing that a justiciable controversy did not exist and the *Contractors Association* did not have standing. Regarding *the standing issue*, we held that:

> In analyzing the facts of the case before us, it is clear that the appellants, members of the West Virginia Utility Contractors Association, and Richard G. Jackson, a member of that association and the presi-

dent of a construction company, were precluded from competing for, and obtaining, contracts to perform work at Laidley Field by the action of the Laidley Field Athletic and Recreational Center Governing Board in awarding contracts without submitting them for competitive bidding. In that sense their rights were affected by governmental action. Under our analysis in *Shobe* the appellants clearly have standing to obtain a declaration of the legal right of the Laidley Field Athletic and Recreational Center Governing Board to enter into contracts without submitting them to competitive bidding.

*Laidley*, 164 W.Va. at 130, 260 S.E.2d at 849.

Based on our discussion above, we find that ACT's members who were interested in bidding for the Red Jacket project were ostensibly denied a claimed legal right. ACT claims that the DOH's letting of the Red Jacket contract to Nicewonder is in violation of our state law governing competitive bidding for highway construction projects, *W.Va.Code*, 5-22-1 *et seq.* The DOH and Nicewonder dispute that state law required competitive bidding for the project. The trial court can resolve that dispute by hearing the case on the merits and entering a declaration as to whether state law required that the Red Jacket Project be submitted for competitive bidding.

Regarding ACT's request for a declaration that the Red Jacket contract violated *W.Va. Code*, 21-5A-1 *et seq.* on the basis that it did not require Nicewonder to pay a "fair minimum rate of wages," we also find that ACT's members were denied a claimed legal right sufficient to establish an actual controversy. In *W.Va.Code*, 21-5A-2, the legislature declared the public policy underlying its adoption of our prevailing wage law for construction of public improvements, stating:

> It is hereby declared to be the policy of the State of West Virginia that a wage of no less than the prevailing hourly rate of wages for work of a similar character in the locality in this State in which the construction is performed, shall be paid to all workmen employed by or on behalf of any

public authority engaged in the construction of public improvements.

The legislature thus made clear its intention that prevailing wages be paid in public improvement construction projects. Section 6 of the Act requires the inclusion into any public project contract the requirement that workmen be paid those prevailing wages.

Our Uniform Declaratory Judgment Act, *W.Va.Code*, 55–13–2 [1941](emphasis added), allows that:

> *Any person* interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

The "any person" in the appeal before us includes any of ACT's affiliated members. ACT's union members have an undeniable interest in determining whether state law has been violated by the DOH's failure to include a prevailing wage requirement in the Red Jacket project. The Red Jacket project entails the expenditure of millions of dollars of public funds. Reason suggests the strong likelihood that a project of that size and duration would eventually depress the local prevailing wage and affect ACT's members. In addressing the federal "prevailing wage" Act (Davis–Bacon Act), the 6th Circuit Court of Appeals in *L.P. Cavett Co. v. U.S. Dept. of Labor*, 101 F.3d 1111, 1113 (6th Cir.1996), appropriately noted that:

> The dual purposes of the [Davis–Bacon] Act are to give local laborers and contractors fair opportunity to participate in building programs when federal money is involved and to protect local wage standards by preventing contractors from bas-

ing their bids on wages lower than those prevailing in the area.

We agree.

For the reasons discussed, we find that at least one of ACT's members meets the first prong of our standard for representation standing, *i.e.*, that at least one of an organization's "members would have standing to sue in their own right." [17]

### Representative Standing—Second Prong

The second prong of our standard for representational standing requires a determination of whether "the interests [ACT] seeks to protect are germane to [its] organization's purpose." Our discussion, *supra*, regarding the composition of ACT's membership makes it abundantly clear that this prong is easily met. Without need to repeat that discussion, we observe that one of ACT's primary functions is that of protecting its members by assuring agency compliance with state law as it pertains to competitive bidding and payment of prevailing wages for public funded construction projects. Accordingly, we find that ACT has met the second prong.

### Representative Standing—Third Prong

The final prong of our representative standing standard is that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." We see nothing in the record to indicate that the participation of ACT's individual members is required for resolution of the justiciable controversy in this action. A declaration by the court will clarify whether or not state law required the DOH to seek competitive bidding for the Red Jacket project and, if state law were violated, the appropriate remedy to address that violation. Similarly, a declaration by the court will clarify whether or not state law requires the inclusion of a prevailing wage clause in the Red Jacket contract and, if so, the appropriate remedy to address that violation.

---

**17.** ACT asserts that one of its functions is to assist its members with collective bargaining agreements. Wage information within collective bargaining agreements are one means by which the Department of Labor may determine the local prevailing wage for a public project. *W.Va. Code*, 21–5A–5(1)[1961], expressly provides, in relevant part, that:

In determining such prevailing rates, the Department of Labor may ascertain and consider the applicable wage rates established by collective bargaining agreements, if any, and such rates as are paid generally within the locality in this State where the construction of the public improvement is to be performed.

## IV. Conclusion

For the reasons set forth herein, we find that ACT has representative standing to seek the declarations contained in its petition. The order of the circuit court dated May 7, 2010, is reversed and this matter is remanded for further proceeding consistent with this Opinion.

Reversed and Remanded.

Justice DAVIS concurs and reserves the right to file a separate opinion.

Justice BENJAMIN dissents and reserves the right to file a separate opinion.

DAVIS, J., concurring:

I agree fully with the majority's conclusion that the Affiliated Construction Trades Foundation (hereinafter referred to as "ACT") possesses representative standing to bring the declaratory judgement action underlying this appeal. Therefore, I concur in the Court's decision to reverse and remand this matter for further proceedings. I choose to write separately to clarify the relevant issue in this appeal, and to point out that the majority has unnecessarily created new points of law where none were needed.

From the outset, it should be made perfectly clear that the issue of standing in this case involved an unincorporated association. In footnote 11 of the majority opinion, it is suggested that this Court's prior holding in Syllabus point 1 of *Chesapeake & Ohio System Federation, Brotherhood of Maintenance of Way Employees v. Hash,* 170 W.Va. 294, 294 S.E.2d 96 (1982), may be construed to imply that an unincorporated association is not required to show standing. Therefore, the majority opinion purports to modify the Chesapeake holding. In my judgment, there was no need to modify Chesapeake and its interpretation of the Uniform Declaratory Judgment Act. In fact, this case could have been disposed of merely by applying this Court's prior holdings in Chesapeake and in *Snyder v. Callaghan,* 168 W.Va. 265, 284 S.E.2d 241 (1981).

In Snyder, this Court addressed, inter alia, the issue of whether a non-profit West Virginia corporation had standing to sue solely as the representative of its members. Following precedent from the United States Supreme Court, the Snyder Court held:

An association which has suffered no injury itself, but whose members have been injured as a result of the challenged action, may have standing to sue solely as the representative of its members when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Syl. pt. 2, *Snyder,* 168 W.Va. 265, 284 S.E.2d 241. Notably, however, the facts upon which the Snyder Court applied this holding involved a corporation. Consequently, the Snyder opinion was silent as to whether the holding also would apply to an unincorporated association.

A little more than six months after the decision in Snyder was handed down, this Court was asked to decide whether an unincorporated association was authorized to bring a suit in its own name under the Uniform Declaratory Judgments Act, W. Va. Code § 55–13–1 et seq. (hereinafter referred to as "the Act"). *See Chesapeake & Ohio Sys. Fed'n, Bhd. of Maint. of Way Emps. v. Hash,* 170 W.Va. 294, 294 S.E.2d 96. The Chesapeake Court observed that the Act, in identifying those who are authorized to bring suit under its terms, utilized the phrase "any person." The Court then observed that

[s]ection 13 of the Act defines the word "person" to mean "any person, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever." (Emphasis added.) The language of this statute clearly authorizes suits by unincorporated associations in the association name and confers upon any such organization the status of a legal entity for purposes of invoking the jurisdiction of the circuit court in declaratory judgment actions.

170 W.Va. at 297–98, 294 S.E.2d at 100. Accordingly, the Chesapeake Court held, at Syllabus point 1, that

[t]he language of the Uniform Declaratory Judgments Act, W. Va.Code § 55–13–1 et seq. (1981 Replacement Vol.), clearly authorizes suits by unincorporated associations in the association name and confers upon any such organization the status of a legal entity for purposes of invoking the jurisdiction of the circuit court in declaratory judgment actions. 170 W.Va. 294, 294 S.E.2d 96.

Because the foregoing holding in Chesapeake established that the Uniform Declaratory Judgments Act authorized ACT, as an unincorporated association, to bring a suit in its own name, the majority opinion should merely have made clear that, when the standing of an unincorporated association is challenged by a party to a declaratory judgment action, the proper analysis is an application of the factors set out in Syllabus point 2 of Snyder. There simply was no need to redraft the Snyder syllabus point or to call the Chesapeake holding into question. Therefore, for the reasons set out above, I respectfully concur.