IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

**FILED**

**June 8, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 21-0235

JEFFERSON COUNTY FOUNDATION, INC.,
Plaintiff Below, Petitioner,

v.

WEST VIRGINIA ECONOMIC DEVELOPMENT AUTHORITY,
and
ROXUL USA, INC. d/b/a ROCKWOOL
Defendants Below, Respondents.

---

Appeal from the Circuit Court of Kanawha County
Business Court Division
The Honorable Christopher C. Wilkes, Judge
Case No. 20-C-332

AFFIRMED

---

Submitted:  March 15, 2022
Filed: June 8, 2022

Robert M. Bastress, Jr., Esq.
Morgantown, West Virginia
Christopher P. Stroech, Esq.
Arnold & Bailey, PLLC

Peter G. Markham, Esq.
Michael E. Caryl, Esq.
Camden P. Siegrist, Esq.
BOWLES RICE LLP

Charles Town, West Virginia

Robert M. Bastress, III, Esq.
Dipiero Simmons McGinley
& Bastress, PLLC
Charleston, West Virginia
Counsel for Petitioner

Charleston, West Virginia
Counsel for Respondent, West Virginia
Economic Development Authority

Joseph V. Schaeffer, Esq.
Babst, Calland, Clements and Zomnir, P.C.
Pittsburgh, Pennsylvania
James A. Walls, Esq.
SPILMAN THOMAS & BATTLE, PLLC
Morgantown, West Virginia
James E. Simon, Esq.
SPILMAN THOMAS & BATTLE, PLLC
Charleston, West Virginia
Counsel for Respondent, Roxul USA, Inc.
d/b/a ROCKWOOL

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE BUNN not participating.

# SYLLABUS BY THE COURT

1.      "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*."  Syllabus Point 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

2.      "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

3.      "An organization has representative standing to sue on behalf of its members when the organization proves that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Syllabus Point 4, *Affiliated Construction Trades Foundation v. West Virginia Department of Transportation*, 227 W. Va. 653, 713 S.E.2d 809 (2011).

4.      "For standing under the Declaratory Judgments Act, it is not essential that a party have a personal legal right or interest."  Syllabus Point 2, *Shobe v. Latimer*, 162 W. Va. 779, 253 S.E.2d 54 (1979).

i

5.    "When significant interests are directly injured or adversely affected by governmental action, a person so injured has standing under the Uniform Declaratory Judgments Act, W.Va.Code s 55-13-1 et seq. (1941) to obtain a declaration of rights, status, or other legal relations."  Syllabus Point 1, *Shobe v. Latimer*, 162 W. Va. 779, 253 S.E.2d 54 (1979).

6.    "The primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature."  Syllabus Point 8, *Vest v. Cobb*, 138 W.Va. 660, 76 S.E.2d 885 (1953).

7.    "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."  Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).

8.    "The assessor of a county may assess the value of a leasehold as personal property separately in an amount such that when the value of the freehold subject to the lease is combined with the value of the leasehold the total reflects the true and actual value of the real property involved."  Syllabus Point 1*, Great A & P Tea Co. v. Davis*, 167 W. Va. 53, 278 S.E.2d 352 (1981).

9.    "The county assessor may presume that leaseholds have no value independent of the freehold estate and proceed to tax all real property to the freeholder at

its true and actual value; the burden of showing that a leasehold has an independent value is upon the freehold taxpayer and the taxpayer must request in a timely manner the separate listing of freehold and leasehold interests." Syllabus Point 2, *Great A & P Tea Co. v. Davis*, 167 W. Va. 53, 278 S.E.2d 352 (1981).

WALKER, Justice:

In 2019, Respondent West Virginia Economic Development Authority adopted a resolution to undertake a series of transactions with Respondent Roxul USA, Inc. d/b/a ROCKWOOL to finance the construction of a manufacturing plant in Jefferson County, West Virginia. Petitioner Jefferson County Foundation, Inc. views the transactions as a "de facto tax abatement" for Rockwool that violates both statute and the West Virginia Constitution, and it has filed suit for a declaration saying so. The Business Court Division of the Circuit Court of Kanawha County has dismissed the Foundation's suit with prejudice, and the Foundation now appeals.

WVEDA is statutorily authorized to engage in the transactions challenged here; those transactions are not an exemption from tax; the West Virginia Economic Development Act does not conflict with West Virginia Code § 11-3-9 (2015) (identifying types of property exempt from taxation); and the transactions do not violate Article X, § 1 of the West Virginia Constitution (demanding equal and uniform taxation). For those reasons, the orders dismissing the Foundation's complaint with prejudice are affirmed.

## I.     FACTUAL AND PROCEDURAL HISTORY

The West Virginia Legislature enacted the West Virginia Economic Development Authority Act (the Act) in 1989.[1] The Act created WVEDA, a state

---

[1] W. Va. Code §§ 31-15-1 to -33.

1

instrumentality intended to serve many purposes, including developing and advancing "business prosperity and economic welfare" of the State of West Virginia and "to borrow moneys and to issue its bonds . . . ; [and] to furnish money and credit or credit enhancement . . . for the promotion of new projects . . . ."[2]  The Legislature declared those to be "public purposes for which public money may be spent and are purposes which will promote the health, safety, morals, right to gainful employment, business opportunities and general welfare of the inhabitants of the state."[3]

The Legislature imbued WVEDA with "all powers necessary or appropriate to carry out the purposes" of the Act.[4]  Relevant to this matter, in West Virginia Code § 31-15-6 (2022), the Legislature empowered WVEDA:

> (2) To determine, upon the proper application of an industrial development agency or an enterprise, whether the declared public purposes of this article have been or will be accomplished by the establishment by such agency or enterprise of a project in this state.
>
> ….
>
> (9) To issue revenue bonds or notes to fulfill the purposes of this article, and to secure the payment of such bonds or notes, all as hereinafter provided.

---

[2] *Id*. § 31-15-3 (2004).

[3] *Id*.

[4] *Id*. at § 31-15-6 (2022).  The Legislature enacted stylistic amendments to § 31-15-6 in 2022.  It also added subsection (42), relating to the Jobs Investment Trust.  S.B. 523, 85th Leg., Reg. Sess. (W. Va. 2022).

(10) To issue and deliver revenue bonds or notes in exchange for a project.

. . . .

(17) To make contracts and to execute all instruments necessary to carry out the powers and duties of [WVEDA] . . . .

. . . .

(21) To acquire, construct, maintain, improve, repair, replace, and operate projects within this state.

. . . .

(24) To acquire, by purchase, lease, donation, or eminent domain, any real or personal property, or any right or interest therein, as may be necessary or convenient to carry out the purposes of [WVEDA].

. . . .

(31) To sell, license, lease, mortgage, assign, pledge, or donate its property, both real and personal, or any right or interest therein to another or authorize the possession, occupancy or use of such property or any right or interest therein by another, in such manner and upon such terms as it deems appropriate.

. . . .

(37) To exercise such other and additional powers as may be necessary or appropriate for the exercise of the powers herein conferred.

3

And, in West Virginia Code § 31-15-17 (1989), the Legislature provided for the exemption of property used or acquired by WVEDA from taxation. To that end, § 31-15-17 states:

> The exercise of the powers granted to [WVEDA] by this article will be in all respects for the benefit of the people of the state for the improvement of their health, safety, convenience and welfare and is a public purpose. As the operation and maintenance of projects financed under this article will constitute the performance of essential governmental functions, [WVEDA] shall not be required to pay any taxes or assessments upon any property acquired or used by [WVEDA] or upon the income therefrom. All bonds and notes of [WVEDA], and all interest and income thereon, shall be exempt from all taxation by this state and any county, municipality, political subdivision or agency thereof, except inheritance taxes.

In May 2019, WVEDA invoked its powers under the Act, generally, and § 31-15-6, particularly, and adopted the "RESOLUTION AUTHORIZING THE ISSUANCE OF BONDS BY THE WEST VIRGINIA ECONOMIC DEVELOPMENT AUTHORITY TO BE EXCHANGED FOR CERTAIN COMMERCIAL FACILITIES AND EQUIPMENT OWNED BY ROXUL USA INC. / D/B/A ROCKWOOL." The Resolution described the issuance of revenue bonds by WVEDA and a series of transactions to be executed with Rockwool, a private, for-profit enterprise that manufactures stone wool insulation for retail, commercial, and industrial markets and which has built a manufacturing facility in Jefferson County, West Virginia.

4

In the Resolution, WVEDA committed to issuing a series of revenue bonds not to exceed $150,000,000, and then exchanging those bonds with Rockwool for ownership of the plant site, facility, and equipment (Project Property). According to the Resolution, WVEDA will then lease the Project Property to Rockwool. Rockwool's lease payments will (1) equal the debt service payments on the bonds, (2) secure the bonds, (3) continue no longer than the term of the bonds, and (4) provide the sole revenue available to WVEDA to service the payments on the bonds. Finally, the Resolution provides that at the end of the lease term, Rockwool will have the option to purchase the Project Property from WVEDA for $1. We adopt the parties' nomenclature and describe the whole of the transactions envisaged in the Resolution as the "sale-leaseback."

In April 2020, the Foundation—a West Virginia non-profit corporation formed with the aim of preserving and protecting the quality of life for all Jefferson County residents—filed a complaint in the Circuit Court of Kanawha County seeking a declaration that (1) WVEDA and Rockwool's conduct violated Article X, Sections 1 and 6 of the West Virginia Constitution, (2) the actions of WVEDA are null, void, and unauthorized by law, and (3) § 31-15-17 is facially vague, overly broad, irrational and unreasonable, and so violates the Foundation's rights under Articles III, § 10 and X, §1 of the West Virginia Constitution.[5]

---

[5] The Foundation alleges that it has a three-member board of directors. According to the Foundation's complaint, those directors own real and/or personal property in

5

Rockwool moved to dismiss the Foundation's complaint under Rules 12(b)(1) and 12(b)(6) of the West Virginia Rules of Civil Procedure in May 2020. WVEDA moved to dismiss the Foundation's complaint in June 2020. That same month, Rockwool and WVEDA jointly moved to refer the case to the Business Court Division under Rule 29.06 of the West Virginia Trial Court Rules. The Foundation responded in opposition to the motion for referral.[6] On December 4, 2020, then-Chief Justice Tim Armstead granted the motion to refer and ordered the matter transmitted to the Business Court Division.

On February 24, 2021, the Business Court entered nearly identical orders granting Rockwool and WVEDA's motions and dismissing the Foundation's complaint with prejudice. The Business Court held that the Legislature had explicitly empowered WVEDA to enter the transactions detailed in the Resolution and which comprise the sale-leaseback. The Business Court also held that neither the sale-leaseback nor § 31-15-17 conflicted with § 11-3-9 (2015), in which the Legislature listed certain types of property that are exempt from taxation. Finally, the Business Court determined that the thrust of the Foundation's complaint is this: that "the sale-leaseback [i.e., the Resolution] is

Jefferson County and pay related taxes. The Foundation claims that the directors will be "damaged by Rockwool's unfair tax treatment . . . ." The Foundation alleges that it and other Jefferson County citizens will be substantially injured and damaged by, in the Foundation's words, WVEDA's "creation of a form of unequal taxation."

[6] The Hon. Tod J. Kauffman, Judge, wrote to Justice Tim Armstead, then Chief Justice of this Court, opposing the motion of Rockwool and WVEDA to refer this case to the Business Court Division.

something the law blesses when it should not." The Legislature, and not the courts, has the authority to remedy that complaint, the court reasoned, so the matter was a non-justiciable political question.

The Business Court went on to analyze what it recognized as a separate question raised in the Foundation's complaint: whether the sale-leaseback violates the guarantee of equal and uniform taxation contained in Article X, § 1 of the West Virginia Constitution. The court rejected the Foundation's theory that it does, concluding that once the transactions comprising the sale-leaseback are complete, Rockwool will possess a leasehold interest in the Project Property and WVEDA will possess a fee interest. At that point, the court reasoned, Rockwool's leasehold interest will be valued separately from WVEDA's fee interest in the Project Property.[7] The court concluded that Rockwool's separate, leasehold will be valued pursuant to the presumption—applicable to *all* leaseholds—that "it has no value independent of the freehold estate"[8] while WVEDA's fee interest will be assessed (presumptively) the full value of the estate. That § 31-15-17 exempts the fee interest held by WVEDA from taxation was of no moment, the Business Court reasoned, because Rockwool's leasehold interest will be a separate estate to be

---

[7] *See, e.g.*, Syl. Pt. 3, *Univ. Park at Evansdale, LLC v. Musick*, 238 W. Va. 106, 792 S.E.2d 605 (2016) (*Musick I*) ("'The assessor of a county may assess the value of a leasehold as personal property separately in an amount such that when the value of the freehold subject to the lease is combined with the value of the leasehold the total reflects the true and actual value of the real property involved.' Syl. Pt. 1, *Great A & P Co. v. Davis*, 167 W.Va. 53, 278 S.E.2d 352 (1981).").

[8] Syl. Pt. 2, in part, *Great A & P Tea Co.*, 167 W. Va. at 53, 278 S.E.2d at 352.

7

valued separately. The court then found that Rockwool "should not have to pay the same taxes on a leasehold as it does on a freehold," and that "the presumption that leaseholds lack independent value does not give rise to an equal and uniform taxation clause violation."

The Foundation now appeals the orders granting Rockwool and WVEDA's motions and dismissing its complaint with prejudice.

## II.    STANDARD OF REVIEW

"Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo*."[9] Likewise, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."[10]

## III.    ANALYSIS

The Foundation assigns three, substantive errors to the Business Court's order dismissing its complaint for declaratory relief. First, the Foundation contends that the lower court erroneously concluded that WVEDA possesses the statutory authority to enter the sale-leaseback. Second, the Foundation argues that the de facto exemption from

---

[9] Syl. Pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995).

[10] Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

tax allegedly granted to Rockwool via the sale-leaseback conflicts with § 11-3-9. Third, the Foundation asserts that the sale-leaseback detailed in the Resolution violates Article X, § 1 of the West Virginia Constitution.[11] But before we consider those arguments, we must take up two jurisdictional matters: the Foundation's standing to pursue declaratory relief and whether it seeks an answer to a non-justiciable political question.

### A.    Standing

WVEDA argued before the Business Court that the Foundation lacked standing to pursue its claim for declaratory relief. The Business Court did not analyze that argument in its order granting WVEDA's motion to dismiss the Foundation's complaint. Nevertheless, "'[s]tanding is a jurisdictional requirement,'"[12] and "this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case."[13]

---

[11] The Foundation also assigns error to the  transfer of this case to Business Court but has not directed the Court's attention to authority supportive of its position that the December 4, 2020, order of transfer is, in fact, an appealable order. In addition, the Foundation did not raise this issue to the Business Court in response to the motions to dismiss or otherwise. For those reasons, the Foundation is not entitled to relief on this assignment of error.

[12] *Men & Women Against Discrimination v. Fam. Prot. Servs. Bd.*, 229 W. Va. 55, 60, 725 S.E.2d 756, 761 (2011) (quoting Franklin D. Cleckley, Robin J. Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b), at 21 (Supp.2004)).

[13] Syl. Pt. 2, in part, *James M.B. v. Carolyn M.*, 193 W. Va. 289, 456 S.E.2d 16 (1995).

As we have explained, "'[g]enerally, standing is defined as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.'"[14] Standing "is gauged by the specific common-law, statutory or constitutional claims that a party presents."[15] When an organization such as the Foundation pursues a claim on behalf of its members, we consider whether that organization has representative standing. On that point, we have held that

> [a]n organization has representative standing to sue on behalf of its members when the organization proves that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[16]

Applying that standard here, the allegations in the Foundation's complaint satisfy prongs (2) and (3). The Foundation alleges that it "educates and advocates for effective and accountable government, sustainable development, and the protection of health, heritage, and the environment," and that its "current priority focus [is] ensuring the accountability of all governmental entities that are involved in and responsible for the

---

[14] *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W. Va. 80, 94, 576 S.E.2d 807, 821 (2002) (quoting BLACK'S LAW DICTIONARY 1413 (7th ed. 1999)).

[15] *Id*. at 213 W. Va. at 94–95, 576 S.E.2d at 821–22 (quoting *Int'l Primate Protection League v. Admin. of Tulane Ed. Fund,* 500 U.S. 72, 77 (1991)).

[16] Syl. Pt. 4, *Aff. Const. Trades Found. v. W. Va. Dep't of Transp.*, 227 W. Va. 653, 713 S.E.2d 809 (2011).

location, construction, permitting, and operation of the proposed [Rockwool] industrial facility in Jefferson County." Those interests dovetail with the declaratory relief the Foundation seeks. Regarding the third prong, the allegations in the Foundation's complaint for declaratory relief do not support the conclusion that the participation of the Foundation's individual members is necessary. In this case, a court's comparison of the component parts of the Resolution to the applicable statutes and constitutional provisions is neither furthered nor hindered by the non-participation of the Foundation's individual members.

Regarding prong (1) (whether at least one member of the Foundation has standing to sue in his own right), WVEDA contends that no Foundation member—and so, the Foundation—can satisfy that requirement because all seek redress of a generalized grievance, and not the "concrete and particularized injury"[17] that is the hallmark of the standing inquiry.[18] Two syllabus points enunciated in *Shobe v. Latimer*[19] weigh against that argument in this case.

---

[17] Syl Pt. 5, in part, *Findley*, 213 W. Va. at 80, 576 S.E.2d at 821.

[18] WVEDA relies upon *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) (holding that state taxpayers "have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers"). WVEDA has not identified any decisions from this State applying *Cuno*.

[19] 162 W. Va. 779, 253 S.E.2d 54 (1979).

11

In *Shobe*, this Court held that "[f]or standing under the Declaratory Judgments Act, it is not essential that a party have a personal legal right or interest."[20] Instead, "[w]hen significant interests are directly injured or adversely affected by governmental action, a person so injured has standing under the Uniform Declaratory Judgments Act, W.Va.Code [§] 55-13-1 et seq. (1941) to obtain a declaration of rights, status, or other legal relations."[21] In *Shobe*, plaintiffs alleged that a water contract between the West Virginia Division of Natural Resources and a public service district violated certain statutes and procedural and substantive due process protections.[22] The plaintiffs were not parties to the contract, but the *Shobe* Court concluded that the plaintiffs had alleged a direct and substantial interest jeopardized by the contract between DNR and the public service district, so their third party status did not bar the action.[23] Relying in large

---

[20] Syl. Pt. 2, *id*.; *see also* W. Va. Code § 55-13-2 (1941) ("Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.").

[21] Syl. Pt. 1, *id*.

[22] *Id*. at 781−84, 253 S.E.2d at 56−58. Plaintiff Shobe alleged that the contract threatened his property and interest as a fisherman of the potentially affected stream. Plaintiff Nester alleged that the contract directly and substantially injured his interest in being able to enjoy the stream, unaltered, and threatened to render the stream unusable for trout fishing. *Id*. at 784, 253 S.E.2d at 58.

[23] *Id*. at 787, 253 S.E.2d at 60.

part on the remedial purpose of the Uniform Declaratory Judgments Act[24] and emphasizing the plaintiffs' allegations that the water contract to be entered into by the DNR was illegal and unconstitutional, the *Shobe* Court held that the plaintiffs' complaint contained sufficient allegations to establish standing to litigate their claims by way of the Uniform Declaratory Judgments Act.

In view of Syllabus Points 1 and 2 of *Shobe*, the Foundation's complaint for declaratory relief contains allegations sufficient to establish standing at this stage of the proceedings. Like the plaintiffs in *Shobe*, the Foundation challenges contracts to be entered into by a public entity. Like the plaintiffs in *Shobe*, the Foundation alleges that those contracts violate both statute and the West Virginia Constitution. And, parallel to the circumstances in *Shobe*, the Foundation seeks a declaration regarding the impact of that public contract on members' interests that arguably fall within those protected by Article X, § 1 of the West Virginia Constitution.[25] Considering *Shobe*, the remedial purpose of

---

[24] *See* W. Va. Code § 55-13-12 (1941) ("This article is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."); *see also City of Martinsburg v. Berkeley Cty. Council*, 241 W. Va. 385, 389, 825 S.E.2d 332, 336 (2019) (recognizing that "declaratory judgments provide certainty for parties as to the extent of their legal rights before undertaking enormous expense or legal obligation").

[25] *Cf. Tug Valley Recovery Ctr., Inc. v. Mingo Cty. Comm'n*, 164 W. Va. 94, 106, 261 S.E.2d 165, 172 (1979) (holding that petitioner had demonstrated direct and substantial interest in "benefits of full and equal taxation" to gain standing to appeal assessment of another's mining estates under W. Va. Code § 11-3-25 (1967) (citing W. Va. Code § 11-3-25 (1967)). The Legislature has repealed § 11-3-25, effective July 1, 2022. *See* 2021 W. Va. Acts 261.

the Declaratory Judgments Act, and the allegations in the Foundation's complaint for declaratory relief, we conclude that the Foundation has standing to proceed.[26]

## B.    *Political Question*

The Business Court concluded that the Foundation's complaint presents a nonjusticiable political question. The court viewed the question posed by the complaint as whether, as a matter of policy, the sale-leaseback *ought* to be lawful. Before this Court, the Foundation argues that its complaint includes straightforward allegations that the sale-leaseback violates the Act and the West Virginia Constitution, and that those allegations do not cross the line into nonjusticiable, political question territory. The Foundation argues further that its claims are easily distinguished from decisions by the Supreme Court of the United States like *Nixon v. United States*[27] and *Rucho v. Common Cause*.[28] The Foundation also argues that this Court has routinely decided cases applying Article X, § 1, and has no

---

[26] The Resolution describes the sale-leaseback in detail, the Authority has adopted the Resolution, the affected parties—the Foundation, WVEDA, and Rockwool—are before the Court, and the questions raised by the Foundation's complaint are purely legal in nature. *See Cox v. Amick*, 195 W. Va. 608, 619, 466 S.E.2d 459, 470 (1995) (Cleckley, J., concurring) (four factors are relevant to determining whether a declaratory judgment action should be heard and decided: (1) "whether the claim involves uncertain and contingent events that may not occur at all" (2) whether "the claim is bound up in the facts" (3) the "presence or absence of adversity," and (4) whether "the granting of relief would serve a useful purpose"). Certainly, a determination of the legality of the sale-leaseback will "serve a useful purpose," *City of Martinsburg*, 241 W. Va. at 389, 825 S.E.2d at 336, and "be of practical assistance," before the Authority incurs $150,000,000 in bond indebtedness and purchases the Project Property.

[27] 506 U.S. 224 (1993).

[28] 139 S. Ct. 2484 (2019).

14

difficulty finding standards to do so. Finally, the Foundation suggests that this Court has not shrunk from resolving questions that have arguably put a toe over the line mentioned above.

Rockwool responds that the sale-leaseback violates neither statute nor the West Virginia Constitution, so that the only question that *can* be presented by the Foundation's complaint for declaratory relief is one of policy, that is, is sale-leaseback good for West Virginia? WVEDA presents similar arguments in support of the Business Court's ruling that the Foundation's complaint presents a nonjusticiable political question.

We concur with the Foundation: the political question doctrine does not bar this litigation. This case presents challenges to the legality of the sale-leaseback under the Act, and "[t]he application of a plain statute . . . is a proper judicial function."[29] Furthermore, "[i]t is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions,"[30] and the Foundation seeks a declaration as to the constitutionality of the sale-leaseback under Article X, § 1. While "courts must use restraint in the exercise of their power to declare legislative acts to be unconstitutional" they also have "a duty to declare such legislative enactment to be invalid when it is clearly

---

[29] *Bennett v. Hix*, 139 W. Va. 75, 83, 79 S.E.2d 114, 118 (1953).

[30] Syl. Pt. 2, in part, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009).

unconstitutional."[31]    In view of those duties and the particular allegations in the Foundation's plea for declaratory relief, we are not faced with a nonjusticiable political question and so proceed to consider the parties' substantive arguments.

## C.    *The Resolution, the Act, and Article X, § 1 of the West Virginia Constitution*

The Foundation views the sale-leaseback as an attempt by Rockwool and WVEDA to leverage the tax-exempt status of property acquired or used by WVEDA to shield Rockwool from "hav[ing] to pay the same real and personal property taxes at the same rates as are assessed and levied against all other Jefferson County citizens and businesses." The Foundation's argument turns on its view that WVEDA "relied upon W. Va. Code § 31-15-17 for the authority to pass the RESOLUTION and acquire title to Rockwool's property, with the result that Rockwool will not have to pay property taxes." At bottom, we understand the Foundation's argument to be this:  the combination of transactions that comprise the sale-leaseback are a de facto and illegal exemption of Rockwool's property from ad valorem taxes.

To the contrary, Rockwool and WVEDA view the sale-leaseback as a series of transactions predicated on the powers granted to WVEDA by the Legislature, generally, and West Virginia Code § 31-15-6, particularly, that will result in WVEDA holding a fee interest and Rockwool holding a leasehold interest in the Project Property. Any tax

---

[31] *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 746–47, 143 S.E.2d 351, 357 (1965).

advantage to Rockwool, they argue, stems from the presumption that a leasehold is valueless. Practically, Rockwool's leasehold may be *presumed* valueless, and the county assessor may "proceed to tax all real property to the freeholder [i.e., the tax-exempt Authority] at its true and actual value . . . ."[32] With this backdrop in place, we turn to the Foundation's arguments.

### 1.    *Authority to Conduct the Sale-Leaseback*

The Foundation first argues that the circuit court erroneously determined that the Act authorizes WVEDA to undertake the transactions described in the Resolution and that comprise the sale-leaseback. Based on its view of the sale-leaseback as a de facto tax exemption, the Foundation concludes that the Act must be "narrowly construed."[33] The Foundation argues that, under a narrow construction, WVEDA may not undertake the sale-leaseback unless the Legislature has explicitly empowered WVEDA to do so. The legislative findings and the Act's salutary purposes do not cut against that narrow view of the WVEDA's powers under the Act, the Foundation argues, because WVEDA "can work to accomplish its objectives and purposes without providing to [Rockwool], a foreign private corporation, a tax exemption via the use of the sale-leaseback scheme at issue here."

---

[32] Syl. Pt. 2, in part, *Great A&P Tea Co.*, 167 W. Va. at 53, 278 S.E.2d at 352.

[33] Syl. Pt. 12, in part, *In re: Hillcrest Gardens*, 146 W. Va. 337, 119 S.E.2d 753 (1961) ("Constitutional and statutory provisions exempting property from taxation are strictly construed.").

Rockwool and WVEDA respond that the Legislature has granted WVEDA the authority to take each *step* necessary to accomplish the sale-leaseback, so that the Legislature's express authorization to execute a sale-leaseback, writ large, is unnecessary. WVEDA also highlights the Legislature's direction that the Act must be liberally construed, while Rockwool emphasizes that the sale-leaseback supports the Act's purpose of promoting industrial development.

### a) The Sale-Leaseback is Not a Tax Exemption

The Foundation is correct that "[c]onstitutional and statutory provisions exempting property from taxation are strictly construed."[34] But as that rule makes plain, it applies to tax exemptions. We concur with Rockwool and WVEDA that the sale-leaseback is a series of transactions that result in two, distinct interests: a fee interest and a leasehold. Importantly—in fact, dispositively—the sale-leaseback goes no further. The Resolution does not declare that the leasehold interest produced by the sale-leaseback shall be exempt from taxation. And, even more importantly, it does not state that the leasehold interest generated by the sale-leaseback shall be exempt from taxation by virtue of West Virginia Code § 31-15-17.

Those circumstances do not fit the mold of the cases the Foundation relies upon to support its argument that the sale-leaseback is a tax exemption, and so the Act must

---

[34] *Id*.

18

be strictly construed. For example, in *In re: Maier*, the Court considered whether the tax exemption afforded counties and municipalities for property leased under the Industrial Development Bond Act (IDBA) extended to a private, for-profit lessor of a county-owned warehouse.[35] This Court held that the IDBA exemption did not extend to the warehouse operator's leasehold interest because it was a separate interest from the county-owned fee interest and the lessee used the leasehold interest primarily to maintain a commercial enterprise.[36]

While the *Maier* Court found that the lease at issue in that case was not exempt from ad valorem taxation under the IDBA, the Court also acknowledged its earlier holding in *State ex rel. County Court v. Demus*, that the IDBA does not contravene Article X, § 1 of the West Virginia Constitution.[37] The *Maier* Court made plain that the two questions—(1) the constitutionality of the IDBA and its tax exemption for certain city and county property, and (2) whether that exemption extended to the leasehold interest held by the private entity—were distinct.[38] In this case, the sale-leaseback does not depend on the extension of § 31-15-17, so the Court's resolution of the second question in *Maier* does not control the outcome, here.

---

[35] *In re Maier*, 173 W. Va. 641, 642, 319 S.E.2d 410, 411 (1984).

[36] *Id*. at 648, 319 S.E.2d at 418.

[37] 148 W.Va. 398, 135 S.E.2d 352 (1964).

[38] *See Maier*, 173 W. Va. at 646, 319 S.E.2d at 415.

The *Maier* Court relied heavily on an earlier decision, *Greene Line Terminal Co. v. Martin*.[39]  There, the lessor of a wharf owned by the City of Huntington claimed that its lease should be exempt from taxation under West Virginia Code § 11-3-9, exempting "property belonging exclusively to any . . . city . . . in this state, and used for public purposes," because it operated the wharf for public use.[40]  The *Greene Line* Court did not accept the lessor's argument, concluding that

> the leasehold at bar was properly assessed separately from the real estate whereon it is based because the latter, being city property in public use, is exempt from taxation. The property's public use operates to the benefit of the city, thereby relieving it from county and state taxes, but *this exemption does not carry through for the benefit of the owner of the leasehold* because the public service rendered by the lessee is only incidental to a business for profit.[41]

In *Maier* and *Greene Line*,[42] this Court analyzed whether statutory tax exemptions for city- and county-owned freeholds extended to leases of that property held

---

[39] 122 W.Va. 483, 10 S.E.2d 901 (1940).

[40] *Id*. at 486, 10 S.E.2d at 904.

[41] *Id*. at 488−89, 10 S.E.2d at 905 (emphasis added).

[42] The Foundation also cites *Hillcrest Memorial Gardens*, 146 W. Va. at 337, 119 S.E.2d at 753.  There, the Court engaged in a similar analysis, although the question was whether the exemption of "cemeteries" from tax, *see* W. Va. Code § 11-3-9 (1931), extended to the personal property of the cemetery's private operator.  *Hillcrest*, 146 W. Va. at 340, 119 S.E.2d at 755.  This Court held that the operator could not claim the benefit of the exemption for the personal property.  *See* Syl. Pt. 4, *id*. at 337, 119 S.E.2d at 754 ("While a cemetery owned and operated by a private corporation is exempt from taxation under Code, 1931, 11–3–9, as amended, such exemption from taxation does not extend to and embrace office furniture and equipment used for corporate purposes; money of the

20

by private entities and used for those entities' benefit. In those cases, the leaseholders' claim that their property interest was exempt from taxation rested on the extension of the statutory tax exemption afforded to the public entities. That is, the lessor in *Maier* claimed the benefit of the IDBA exemption and the lessor in *Greene Line* claimed the benefit of the exemption from tax granted to city and county property used for public purposes.

That precise issue is not presented by the sale-leaseback. The Resolution does not declare that the leasehold interest produced by the sale-leaseback shall be exempt from taxation. And, even more importantly, it does not state that the leasehold interest generated by the sale-leaseback shall be exempt from taxation via the extension of West Virginia Code § 31-15-17.[43] For those reasons, the Foundation's contention that *Maier* and *Greene Line* command a strict construction of the Act is unpersuasive, and we construct the Act as the Legislature has commanded: "liberally and . . . to promote the purposes set out in" West Virginia Code § 31-5-3.[44]

---

corporation on hand or on deposit in a bank; or notes and accounts receivable representing the proceeds of the sale of burial lots in such cemetery.").

[43] The Foundation directs the Court's attention to *Gables Realty Ltd. Partnership v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 872 (Tex. App. 2002), to support its contention that the sale-leaseback scheme violates the uniform and equal tax treatment demanded by Article X, § 1 of the West Virginia Constitution. Like *Greene Line* and *Maier*, in that case the issue was whether a private, for-profit lessee could successfully extend the tax exemption afforded to the underlying, publicly owned fee interest to exempt his leasehold interest. That is not the issue presented by the sale-leaseback.

[44] W. Va. Code § 31-15-33 (1989).

### b) *The Act Authorizes the Sale-Leaseback*

As stated above, the Legislature found that many injurious economic conditions necessitated passage of the Act and creation of WVEDA.[45] The Legislature charged WVEDA with pursuing numerous public purposes to address those conditions, including, "to develop [and] advance the business prosperity and economic welfare of the State of West Virginia; [and] encourage and assist in the location of new business and industry. . . ."[46] The Legislature has granted WVEDA "all powers necessary to carry out the purposes" of the Act. Specifically, in § 31-15-6, the Legislature has authorized WVEDA to determine whether a certain project will accomplish the public purposes declared in the Act;[47] issue revenue bonds and to secure payment of those bonds to fulfill the purposes of the Act;[48] deliver those bonds in exchange for a project;[49] "make contracts and to execute all instruments necessary to carry out the powers and duties of WVEDA";[50] acquire projects;[51] "acquire, by purchase, lease, donation, or eminent domain, any real or personal property, or any right or interest therein, as may be necessary or convenient to

---

[45] *Id*. at § 31-15-2 (2004).

[46] *Id*. at § 31-15-3 (2004).

[47] *Id*. at § 31-15-6(2).

[48] *Id*. at § 31-15-6(9).

[49] *Id*. at § 31-15-6(10).

[50] *Id*. at § 31-15-6(17).

[51] *Id*. at § 31-15-6(21).

22

carry out the purposes of WVEDA;"[52] sell or lease its property "in such manner and upon such terms as it deems appropriate;"[53] and "exercise such other and additional powers as may be necessary or appropriate for the exercise of the powers herein conferred."[54]

"The primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature."[55] When the Legislature's intent is plain, our role is limited. As we have said, "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such cases it is the duty of the courts not to construe but to apply the statute."[56] The provisions cited above are clear; thus, the Legislature's intent is plain and the Court's work is simply to apply the statutes. In doing so, it is apparent that the Act authorizes WVEDA to enter the sale-leaseback. Section 31-15-6(i) authorizes WVEDA to take the initial step specified in the Resolution: to issue revenue bonds.[57] Subsection (j) authorizes WVEDA to exchange those bonds with Rockwool for the Project Property, and subsection (x) authorizes WVEDA to purchase the fee interest in the Project Property from Rockwool. Subsection (ee)

---

[52] *Id*. at § 31-15-6(24).

[53] *Id*. at § 31-15-6(31).

[54] *Id*. at § 31-15-6(37).

[55] Syl. Pt. 8, *Vest v. Cobb*, 138 W. Va. 660, 76 S.E.2d 885 (1953).

[56] Syl. Pt. 5, State v. *General Daniel Morgan Post No. 548*, V.F.W., 144 W. Va. 137, 107 S.E.2d 353 (1959).

[57] *See also* W. Va. Code § 31-15-9(a) (1989).

authorizes the next steps specified in the Resolution: leasing the Project Property to Rockwool, as well as WVEDA's sale of the Project Property to Rockwool at the end of the lease term. In sum, by the plain terms of the Act, the Legislature has authorized WVEDA to engage in the transactions specified in the Resolution and which comprise the sale-leaseback.[58] For the reasons discussed above, WVEDA has not exceeded the powers granted it by the Legislature in the Act by adopting the Resolution to enter the sale-leaseback.

### 2. *W. Va. Code §§ 31-15-17 and 11-3-9*

The Foundation next contends that West Virginia Code § 31-15-17 (exempting property acquired or used by WVEDA from taxation) conflicts with West Virginia Code § 11-3-9, in which the Legislature has designated various species of property exempt from taxation. The Foundation again argues that the Legislature has not enacted an express exemption "for the type of sale-leaseback arrangement that Rockwool will

---

[58] The Foundation's contention that the Legislature's findings, articulation of the purposes of WVEDA, and broad grant of power to WVEDA are irrelevant to the application of the Act in this case because, in the Foundation's words, "the [Authority] can work to accomplish its objectives and purposes without providing to [Rockwool], a foreign private corporation, a tax exemption via the use of the sale-leaseback scheme at issue here." Again, where a statute is clear, a court's role is to apply it. Application of the clear language of § 31-15-6 to the sale-leaseback arrangement described in the Resolution results in one conclusion: the Legislature has authorized WVEDA to conduct the transactions comprising the sale-leaseback. It is not for this Court to read into the Act a prohibition on the structuring of those authorized transactions in the manner described in the Resolution; we will not "'read into [a statute] that which it does not say.'" *Rowe v. Sisters of Pallottine Missionary Soc'y*, 211 W. Va. 16, 25, 560 S.E.2d 491, 500 (2001) (quoting *Banker v. Banker*, 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996)).

enjoy," so that the sale-leaseback is a de facto, unauthorized exemption from ad valorem taxation for Rockwool's property under § 31-15-17.

Section 11-3-9 is a manifestation of the Legislature's authority to enact exemptions from taxation, with the bounds of Article X, § 1, which in turn provides that

> Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. * * * but property used for educational, literary, scientific, religious or charitable purposes, all cemeteries, public property * * * may by law be exempted from taxation.

Article X, § 1 "does not [itself] exempt property from taxation;" instead, it "empowers the legislature to create exemptions for certain types of property."[59]

The Legislature has exercised that power to enact certain exemptions in West Virginia Code § 11-3-9. The Foundation contends that the statute is an "exhaustive list of property tax exemptions" enacted by the Legislature and that because the statute does not include "real and personal property owned and leased pursuant to the terms of the RESOLUTION at issue here," it is an illegal tax exemption. The Foundation first highlights a perceived conflict between those property interests and the exemptions from taxation enacted by the Legislature in § 11-3-9(a)(2) and (3) for "[p]roperty belonging

---

[59] *Wellsburg Unity Apts., Inc. v. Cnty. Comm'n of Brooke Cty.*, 202 W. Va. 283, 286, 503 S.E.2d 851, 854 (1998).

exclusively to the state," and "[p]roperty belonging exclusively to any county, district, city, village or town in this state and used for public purposes" respectively.

The Foundation also suggests that the sale-leaseback conflicts with certain exemptions available under § 11-3-9 to charities; nonprofit power, water, natural gas, and sewer services; nonprofit economic development corporations; benevolent associations; and homes for children, the aged, or the infirm.[60] Those exemptions from taxation of property held by private organizations hinge on whether the relevant property is leased out or conducted for private profit; according to the Foundation, that caveat demonstrates that the "Legislature has not provided tax exemptions to a project *owned, operated or leased out for private profit*."[61] Because Rockwool—a private, for-profit enterprise—will lease the Project Property under the terms of the sale-leaseback, the Foundation contends that the sale-leaseback itself violates § 11-3-9.[62]

The Foundation's arguments are unavailing. We first reiterate the conclusions stated above: Rockwool has not claimed that § 31-15-17 applies to its interest in the Project Property (either fee or leasehold) and the sale-leaseback is a series of

---

[60] *See* W. Va. Code § 11-3-9(a)(12), (13), (14), (16), and (19).

[61] Emphasis in original.

[62] The Foundation asserts in its brief, "Notwithstanding how [Rockwool and WVEDA] wish to characterize the Rockwool project, and notwithstanding a leasehold term or otherwise, an express exemption has not been adopted for the type of sale-leaseback arrangement that Rockwool will enjoy."

26

legislatively-authorized transactions, and not a tax exemption. And, even accepting the Foundation's baseline premise that WVEDA relied upon § 31-15-17 to adopt the Resolution, we do not agree with the Foundation that § 31-15-17 is in fatal conflict with § 11-3-9. Section 11-3-9 is not—by its plain terms—an exhaustive list of the types of property the Legislature has exempted from taxation.[63] While the Foundation emphasizes § 11-3-9(a)(2) and (3) and the exemptions granted to charitable organizations subject to certain conditions, it does not account for § 11-3-9(a)(30), which exempts from taxation "[a]ny other property or security exempted by *any other provision of law*."[64] This section, then, allows for the existence of exemptions from taxation elsewhere in the Code; § 31-15-

---

[63] Were §§ 31-15-17 and 11-3-9 in "apparent conflict, the Court must, if reasonably possible, construe such statutes so as to give effect to each." Syl. Pt. 4, in part, *State ex rel. Graney v. Sims,* 144 W. Va. 72, 105 S.E.2d 886 (1958). "The general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled." Syl. Pt. 1, *UMWA by Trumka v. Kingdon,* 174 W. Va. 330, 325 S.E.2d 120 (1984). Applying that rule here, § 31-15-17, as the more specific statute, takes precedence over § 11-3-9, so that the conflict would be resolved in favor of § 31-15-17.

[64] W. Va. Code § 11-3-9(a)(30).

27

17 is an example.[65]  For those reasons, it is apparent that § 31-15-17 does not conflict with § 11-3-9, and the Foundation is not entitled to relief on this assignment of error.[66]

### 3.    *Article X, §1 of the West Virginia Constitution*

Finally, the Foundation contends that the sale-leaseback violates Article X, § 1 of the West Virginia Constitution.  Article X, § 1 of the West Virginia Constitution requires that, subject to the exceptions listed there, "taxation shall be equal and uniform through the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law."  The Foundation argues that this Court's cases have articulated "dual concerns about inequality with regards to tax exemptions of private enterprises," namely that those exemptions excuse some taxpayers from paying their fair share in support of the State and advantage some private enterprises over others. The Foundation asserts that the sale-leaseback is a "sham structure perpetrated for Rockwool" and that it "hide[s] a huge tax break for a strictly private, profit-making

---

[65] The Foundation states that West Virginia Code § 8-19-4 (2020) (exempting from taxation "the real and personal property which a municipality or county has acquired and constructed according to the provisions of this article, and any leasehold interest therein held by other persons") expressly provides for the type of sale-leaseback detailed in the Resolution, then states that § 31-15-17 does not.  But that contrast is of no moment; the sale-leaseback is predicated on the powers of WVEDA enumerated in § 31-15-6 and not on the extension of § 31-15-17 to the leasehold interest resulting from the sale-leaseback.

[66] This Court has recognized that the Legislature may enact tax exemptions beyond § 11-3-9 so long as the exemption does not exceed the authority granted to the Legislature in Article X, § 1 of the West Virginia Constitution.  *See Demus*, 148 W. Va. at 406, 135 S.E.2d at 358 (1964) (legality of tax exemption statute in IDBA judged against Article X, § 1 of the West Virginia Constitution).

28

enterprise." For those reasons, the Foundation concludes that, the sale-leaseback itself violates Article X, § 1 of the West Virginia Constitution.[67]

Like the Business Court, we do not find the Foundation's argument persuasive. As observed above, the Resolution details a series of transactions—which the Act authorizes WVEDA to conduct—that will result in WVEDA holding a fee interest in the Project Property and Rockwool holding a lease in the same. Those interests are distinct, as "[a] leasehold, separate from the fee from which it has been carved, is property 'which the law recognizes as a thing of value, but is incorporeal and intangible in its nature.'"[68] Fundamentally, the Resolution does not purport to exempt property from taxation nor does it contain any representation that the exemption from taxation applicable to property acquired or used by WVEDA is to be extended to Rockwool's leasehold interest.

Instead, as Rockwool concedes, the leasehold generated by the sale-leaseback will be subject to the general rules of *valuation* of a leasehold, set out in Syllabus Points 1 and 2 of *Great A & P*:

---

[67] The Foundation's reliance on *Maier* to support this constitutional argument is misplaced. We have already observed that in *Maier*, the issue was whether the tax exemption under the IDBA applied to a county-owned industrial site could be extended to the warehouse operator's lease of that site. We held that assessment of the leasehold did not violate the exemption under the IDBA. In contrast, the sale-leaseback does not entail extension of the tax exemption in § 31-15-17 to the leasehold interest created in Rockwool—a key and dispositive distinction from *Maier*.

[68] *Greene Line*, 122 W. Va. at 483, 10 S.E.2d at 903 (quoting *Dillon v. Bare & Carter*, 60 W.Va. 483, 490, 56 S.E. 390, 393 (1906)).

29

1.     The assessor of a county may assess the value of a leasehold as personal property separately in an amount such that when the value of the freehold subject to the lease is combined with the value of the leasehold the total reflects the true and actual value of the real property involved.[69]

2.     The county assessor may *presume* that leaseholds have no value independent of the freehold estate and proceed to tax all real property to the freeholder at its true and actual value; the burden of showing that a leasehold has an independent value is upon the freehold taxpayer and the taxpayer must request in a timely manner the separate listing of freehold and leasehold interests.[70]

In sum, the Resolution does not purport to exempt the leasehold produced by the sale-leaseback from taxes.[71]  And as Rockwool acknowledges, the leasehold resulting from the sale-leaseback will be subject to the same principles of valuation applicable to all

---

[69] Syl. Pt. 1, *Great A & P Tea Co.*, 167 W. Va. at 53, 278 S.E.2d at 354.

[70] Syl. Pt. 2, *id*. (emphasis added).

[71] The Foundation's brief is unclear as to whether it contends that application of the exemption in § 31-15-17 to WVEDA's freehold interest in the Project Property that results from the sale-leaseback violates Article X, § 1.  But that argument cannot prevail because we have held that "[w]hether or not property *other than cemeteries and public property* may be exempted from taxation under the Constitution of this state is to be determined by the use to which it is applied."  Syl. Pt. 4 of *Reynolds Mem. Hosp. v. Marshall Cnty. Ct.*, 78 W. Va. 685, 90 S.E. 238 (1916) (emphasis added).  So, the use to which the Authority (a state instrumentality) puts the property it owns or acquires in furtherance of what the Legislature has found to be a public purpose cannot determine of the applicability of the exemption crafted by the Legislature in § 31-15-17.  And, in *Demus*, we held that a tax exemption in the IDBA like § 31-15-17 did not violate Article X, § 1.  *Demus*, 148 W. Va. at 398, 135 S.E.2d at 352.  While the *Maier* Court later held that the lessor of county-owned property in that case could not claim the IDBA exemption for his leasehold interest, that holding does not speak to the applicability of the exemption to the county's freehold interest.

leaseholds.[72]  Consequently, neither the Resolution nor the sale-leaseback violates Article X, § 1 of the West Virginia Constitution.[73]

## IV.    CONCLUSION

For the reasons discussed above, the February 24, 2021 orders dismissing with prejudice the Foundation's complaint for declaratory judgment are affirmed.

AFFIRMED

---

[72] Syllabus Point 2 of *Great A&P* articulates a presumption of no-value.  But an assessor may yet value a leasehold separately and independently from the freehold if it is a "'bargain lease, and is freely assignable so that the lessee may realize the benefit of such bargain in the marketplace.'"  *Musick v. Univ. Park at Evansdale, LLC*, 241 W. Va. 194, 203, 820 S.E.2d 901, 910 (2018) (*Musick II*) (quoting *Maplewood Comm., Inc. v. Craig*, 216 W. Va. 273, 607 S.E.2d 379 (2004)).

[73] The Foundation also contends that reversal is warranted because the Business Court failed to consider its claim that § 31-15-17 is, "on its face, vague, overly broad, irrational, unreasonable and/or violates [the Foundation's] rights under Article III, Section 10 . . . of the West Virginia Constitution."  As stated above, the sale-leaseback is comprised of a series of transactions to be affected by WVEDA pursuant to its authority under § 31-15-6.  The Resolution does not claim to extend the tax exemption afforded to property acquired or used by WVEDA in § 31-15-17 to the leasehold produced by the sale-leaseback.  Consequently, the Foundation's claim that § 31-15-17 violates Article III, § 10 of the West Virginia Constitution is moot.